UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CHRISTOPHER CONNOR MCCLAIN,<br>DENNIS ABRAMOV, MILES COLLINS,<br>JEFFREY BUTLER HANSON, JR.,<br>RICKY LEBLANC, SAMUEL SHEPHERD,<br>WILLIAM TENNANT, OHIANA NEGRETE<br>JOSE MORA, NATHAN BARNES,<br>STEVEN MORTON, and DANIEL BIANCA,<br><br>Plaintiffs,<br><br>v.<br><br>CAPE AIR,<br><br>Defendant. | Case No. 22-cv-10649-DJC |

MEMORANDUM AND ORDER

CASPER, J.                                                                                    May 22, 2023

I.      Introduction

Plaintiffs Christopher Connor McClain ("McClain"), Dennis Abramov ("Abramov"), Miles Collins ("Collins"), Jeffrey Butler Hanson, Jr. ("Hanson"), Ricky LeBlanc ("LeBlanc"), Samuel Shepherd ("Shepherd"), William Tennant ("Tennant"), Ohiana Negrete ("Negrete"), Jose Mora ("Mora"), Nathan Barnes ("Barnes"), Steven Morton ("Morton") and Daniel Bianca ("Bianca"), (collectively, "Plaintiffs") have sued Defendant Cape Air alleging violation of the minimum wage under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216, (Count I) and Mass. Gen. L. c. 151 §§ 1, 20 (Count II), coerced labor in violation of the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. § 1595, (Count III) violation of the Massachusetts Civil Rights Act ("MCRA"), Mass. Gen. L. c. 12 § 11H–I, (Count IV) and unjust enrichment (Count

V).  D. 5.  Plaintiffs McClain, Collins, LeBlanc, Shepherd, Negrete, Bianca, Morton, Tennant, and Abramov also allege breach of contract (Count VI) and breach of the implied covenant of good faith and fair dealing (Count VII).  D. 5.  Cape Air moved to dismiss all counts.  D. 19–D. 30.  For the reasons stated below, the Court ALLOWS Cape Air's motions to dismiss, D. 19–D. 30, in part and DENIES them in part.

## II.   Standard of Review

### A.   Dismissal for Lack of Subject Matter Jurisdiction under Rule 12(b)(1)

Under Fed. R. Civ. P. 12(b)(1), a defendant may move to dismiss a complaint for lack of subject matter jurisdiction.  "[T]he party invoking the jurisdiction of a federal court carries the burden of proving its existence."  Murphy v. United States, 45 F.3d 520, 522 (1st Cir. 1995) (quoting Taber Partners, I v. Merit Builders, Inc., 987 F.2d 57, 60 (1st Cir. 1993)).  When confronted with such a motion, "the district court must construe the complaint liberally, treating all well-pleaded facts as true and indulging all reasonable inferences in favor of the plaintiff." Aversa v. United States, 99 F.3d 1200, 1209–10 (1st Cir. 1996) (citing Murphy, 45 F.3d at 522). The Court, however, may widen its gaze and look beyond the pleadings to determine jurisdiction. See Martínez-Rivera v. Puerto Rico, 812 F.3d 69, 74 (1st Cir. 2016).  Further, "[w]hen faced with motions to dismiss under both 12(b)(1) and 12(b)(6), a district court, absent good reason to do otherwise, should ordinarily decide the 12(b)(1) motion first."  Ne. Erectors Ass'n v. Sec'y of Lab., 62 F.3d 37, 39 (1st Cir. 1995).

### B.   Dismissal for Failure to State a Claim under Rule 12(b)(6)

On a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the Court must determine if the facts alleged "plausibly narrate a claim for relief."  Germanowski v. Harris, 854 F.3d 68, 71 (1st Cir. 2017).  Reading the complaint "as a whole," the Court must conduct a two-step, context-specific inquiry.  García-Catalán v. United States, 734 F.3d 100, 103 (1st Cir. 2013).  First, the

Court must perform a close reading of the claim to distinguish the factual allegations from the conclusory legal allegations contained therein.  Id.  Factual allegations must be accepted as true, while conclusory legal conclusions are not entitled credit.  Id.  Second, the Court must determine whether the factual allegations present a "reasonable inference that the defendant is liable for the misconduct alleged."  Haley v. City of Boston, 657 F.3d 39, 46 (1st Cir. 2011) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).   In sum, the complaint must provide sufficient factual allegations for the Court to find the claim "plausible on its face."  García-Catalán, 734 F.3d at 103 (quoting Iqbal, 556 U.S. at 678).

## III.    Factual Background

Except where otherwise noted, the following facts are drawn from Plaintiffs' amended complaint, D. 5, and are accepted as true for the purpose of resolving Cape Air's motions to dismiss.

Plaintiffs were pilots seeking Airline Transport Pilot ("ATP") certification, a requirement to pilot commercial air flights.  D. 5 ¶ 32.   Generally, a pilot must achieve 1,500 hours of flight time to be eligible to take the ATP practical test.  Id. ¶ 34.  Plaintiffs allege that "the cost of ATP certification is less than $10,000."  Id. ¶ 81.

Between 2019 and 2021, Plaintiffs each signed and accepted employment offer letters[1] with Cape Air.  Id. ¶¶ 6–29, 52.  All of the Plaintiffs—except for Abramov, whom the Court addresses separately below—had obtained "several hundred hours of flight time" prior to being hired by Cape Air, but needed additional hours to become eligible for the ATP practical test.  Id. ¶ 53.  These Plaintiffs agreed to work as First Officers for at or near the Massachusetts minimum

---

[1] Plaintiffs' offer letters were submitted by Cape Air in support of its motions to dismiss, D. 32-1; 33-1; 34-1; 35-1; 36-1; 37-1; 38-1; 39-1; 40-1; 41-1; 42-1; 43-1, and were incorporated by reference into the amended complaint, D. 5 ¶ 52.

hourly wage.  Id. ¶¶ 37, 55; see, e.g., D. 32-1.  In exchange for paying the Plaintiffs at a lower hourly rate than the Plaintiffs could otherwise have earned from a different employer, Cape Air "commit[ted]" in the offer letters to providing each Plaintiff "the necessary experience to successfully obtain [the Plaintiff's] ATP certificate and qualify [the Plaintiff] as a Captain for Cape Air."  D. 5 ¶¶ 52, 54; see, e.g., D. 32-1.  The employment offer letters also required each Plaintiff to work for Cape Air as a Captain for a minimum period after obtaining ATP Certification, ranging between twelve to eighteen months.  See, e.g., D. 40-1 (requiring employment as Captain for eighteen months); D. 41-1 (requiring employment as Captain for twelve months); see D. 5 ¶ 56 (alleging that "each of the Plaintiffs agreed to work for Defendant Cape Air as a captain for at least 15 months after attaining ATP certification" (emphasis in original)).  These offer letters required any Plaintiff who resigned or was terminated for cause before completing the minimum period as Captain to "repay the reasonable costs and training investment in your training," which was "acknowledged to be thirty thousand dollars ($30,000)."    D. 5 ¶ 57; see, e.g., D. 32-1.  The Plaintiffs also each signed a promissory note within few days of accepting their employment offers promising to repay the $30,000 sum, characterized as a "Training Investment," to Cape Air if they failed to work as Captains for the minimum period.  See, e.g., D. 32-3.[2]

    As suggested above, Abramov was the only Plaintiff who had already attained 1,500 hours of flight time prior to his employment at Cape Air.  D.  5 ¶ 58.  Accordingly, Abramov's March 31, 2020 employment offer letter stated that he would be hired as a Captain.  D. 34-1.  The offer

---

[2] Cape Air attached the promissory notes to its motions to dismiss.  D. 32-3; 33-3; 34-3; 35-3; 36-3; 37-3; 38-3; 39-3; 40-3; 41-3; 42-3; 43-3.  Although the amended complaint does not explicitly reference any promissory note except for Abramov's, D. 5 ¶ 59, the Court may consider the remaining Plaintiffs' promissory notes, even under Rule 12(b)(6), because the notes are "central to plaintiffs' claims" and their "authenticity . . . [are] not in dispute by the parties."  Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993).

also provided that Abramov would receive "pilot training" at a "substantial" investment and acknowledged Cape Air's "expectation that upon successful completion of [his] training, [Abramov] will serve as a pilot for a minimum of 12 months." Id. Abramov's offer letter did not mention any requirement that Abramov to repay training costs if he left before the end of the 12-month period. Id. Nearly five months later, on August 28, 2020, Cape Air required Abramov, as it had with other Plaintiffs, to sign a promissory note to repay a $30,000 "Training Investment" if he resigned or was terminated for cause prior to serving as a Captain for twelve months. D. 34-3; D. 5 ¶ 59.

Abramov, Barnes, Mora and Hanson completed ATP certification during their Cape Air employment and began working as Captains (collectively, the "Captain Plaintiffs"). D. 5 ¶¶ 77–82. Shortly after starting to work, however, the remaining Plaintiffs McClain, Collins, Leblanc, Shepherd, Negrete, Bianca, Morton and Tennant (collectively, the "First Officer Plaintiffs") "realized that [Cape Air] did not intend to offer them enough flight hours to become ATP eligible." Id. ¶ 66. Plaintiffs allege that a comparable Federal Aviation Authority-certified pilot training program offers 80 hours of flight time per month, but that the First Officer Plaintiffs went weeks without receiving flight time or received only a few hours of flight time per month. Id. ¶¶ 67–69. Cape Air also allegedly delayed onboarding the First Officer Plaintiffs and Abramov. Id. ¶ 70. As a result, the First Officer Plaintiffs were not able to complete ATP certification and begin working as Captains. Id. ¶ 75.

Both the Captain and First Officer Plaintiffs resigned from Cape Air prior to completing the minimum required of period of service for Captains. See id. ¶¶ 74–75, 82, 85, 90–91, 121. Cape Air has "demanded" that all Plaintiffs pay the $30,000 training investment. Id. ¶ 74. Only McClain paid Cape Air $30,000 after receiving such demands. Id. ¶ 76.

**IV.     Procedural History**

McClain filed this action on April 29, 2022, D. 1, and subsequently amended his complaint to include his co-Plaintiffs, D. 5.  Cape Air has moved to dismiss to all counts, D. 19–D. 30.  The Court heard the parties on the pending motions to dismiss and took the matter under advisement. D. 62.

**V.     Discussion**

**A.     <u>Lack of Jurisdiction Over Claims Preempted by the Railway Labor Act</u>**

The Court begins by addressing Cape Air's arguments that Plaintiffs' claims for breach of contract and unjust enrichment are preempted by the Railway Labor Act and thus outside this Court's jurisdiction. D. 32 at 15.[3]  Under the RLA, "minor" disputes involving "the interpretation or application of existing labor agreements" are subject to mandatory dispute resolution mechanisms.  <u>Hawaiian Airlines, Inc. v. Norris</u>, 512 U.S. 246, 253, 256 (1994); <u>see</u> 45 U.S.C. § 151a (stating that the purpose RLA, among other things, is "to provide for the prompt and orderly settlement of all disputes growing out of grievances or interpretation or application of agreements covering rates of pay, rules, or working conditions").  "[A] determination that [a party's] complaints constitute a minor dispute would preempt [ ] state-law actions."  <u>Adames v. Exec. Airlines, Inc.</u>, 258 F.3d 7, 11 (1st Cir. 2001) (quoting <u>Norris</u>, 512 U.S. at 252-53).  "Given that a state law claim requiring interpretation of [a collective bargaining agreement] is preempted, the key question becomes whether resolution of a dispute 'hinges upon' such interpretation."  <u>Id.</u>

---

[3] Although Cape Air filed separate motions to dismiss as to each Plaintiff, it relies upon the same or substantially the same legal arguments as to all.  Accordingly, the Court cites to only one of Cape Air's motions (and memorandum in support of same) when addressing Cape Air's arguments.

"State law claims requiring only consultation with the [collective bargaining agreement], versus actual interpretation, should not be extinguished."  Id. at 12.

### 1.   Breach of Contract by Cape Air (Count VI)

Because Plaintiffs withdrew from their Cape Air employment prior to serving a minimum period as Captains, they all "seek a declaration that they did not breach the underlying contract" under Count VI.  D. 5 ¶¶ 117–118.  In addition, the First Officer Plaintiffs and Abramov claim that Cape Air "breached the contract provision requiring Cape Air to 'provide [each Plaintiff] . . . the necessary experience to obtain your ATP certificate.'"  Id. ¶ 119.[4]  Cape Air argues that Plaintiffs' breach of contract claims are preempted by provisions in the collective bargaining agreement between Cape Air and Plaintiffs' union ("CBA") regarding the procedures for pilot training.  E.g., D. 32 at 16–17.[5]  Plaintiffs counter that the basis for their claims is "the employment agreement and the promissory note they signed with Cape Air" rather than the CBA.  D. 55 at 14.

The Court agrees that the source of Plaintiffs' obligations is their employment offer letters and promissory notes, not the CBA.  D. 32-1; D. 32-3.  Plaintiffs' obligation to remain employed as Cape Air Captains for a minimum period (or pay a purported training investment) in exchange for Cape Air's "commit[ment] to providing [Plaintiffs] the necessary experience to obtain [their]

---

[4] Although the amended complaint indicates that Abramov asserts the same breach of contract claim as the First Officers, D. 5 ¶ 119, Abramov's employment offer letter does not contain any reference to ATP certification.  See D. 34-1.  For the purposes of considering the motions to dismiss, the Court construes Abramov's claim to assert that Cape Air breached its obligation to provide him the training described in his offer letter.  Id. (stating that Cape Air will provide "pilot training" in accordance with various training materials).

[5] Cape Air attached portions of the CBA to its motions to dismiss.  See, e.g., D. 32-2.  Although the amended complaint does not explicitly reference the CBA, the Court may consider the CBA when assessing whether subject matter jurisdiction exists under Rule 12(b)(1).  See Martínez-Rivera, 812 F.3d at 74.  The Court may also consider the CBA on a Rule 12(b)(6) motion because its "authenticity . . . [is] not in dispute by the parties" and it is incorporated by reference into the Plaintiffs' employment offer letters.  Watterson, 987 F.2d at 3; D. 32-1 (stating that "terms of your employment will be governed by the collective bargaining agreement").

ATP certificate" is not addressed by the CBA and does not turn on interpretation or application of the CBA.  See, e.g., D. 32-2.

At most, the CBA references other documents that outline the content of Cape Air's various training programs, describes some of the related procedures and sets forth channels of communication between the union and Cape Air to address concerns.  See, e.g., D. 32-2 at 6 (providing that pilots will received a class schedule); id. at 10 (describing role of training committee and stating that Cape Air "shall provide ground and flight training as outlined in the Company's FAA-approved training program").  The "Part 135 First Officers" section of the CBA contains multiple references to the acquisition of flight time by First Officers so that they can become Captains.  Id. at 16 (stating "[i]t is the objective of the parties that the Part 135 First Officers ('135 FOs') build their flying time and experience in order to upgrade to Captain as rapidly as possible"); id. at 19 (acknowledging that First Officers who are unsuccessful in training "need not be reassigned to their previous Positions" because the "intent" of First Officer program is to "create future Captains").  The CBA also exempts ATP training from a provision setting forth the maximum consecutive training days that may be scheduled.  Id. at 8.  That is, although the CBA contemplates some form of training for Cape Air pilots and First Officers, it does not impose any obligation on Cape Air to provide the requisite number of flight hours for Plaintiffs to obtain ATP certification.

The heart of the Plaintiffs' breach of contract claims arise from Cape Air's promise to provide the necessary training to achieve ATP certification in exchange for Plaintiffs' promise to remain employed as a Captain for a minimum period thereafter.  See D. 5 at ¶¶ 46, 52–57, 119– 120.  Cape Air's obligation to provide ATP flight hours stems from the Plaintiffs' employment offer letters, rather than the CBA.  Although the Court may need to consult CBA or resolve factual

questions about Cape Air's training program and motives when assessing the breach of contract claims, such claims do not require interpretation of the CBA's terms and are not preempted.  Locke v. U.S. Airways, Inc., No. 11-cv-11350-RWZ, 2013 WL 5441725, at *3 (D. Mass. Sept. 27, 2013 (holding that there was no preemption of plaintiff's state law claims where his termination was governed by "individualized" last chance agreement with employer rather than the CBA), aff'd, 764 F.3d 73 (1st Cir. 2014); see Allied Elevator Grp. Inc. v. 3Phase Elevator Corp., No. CV 20-11557-RGS, 2020 WL 6151096, at *3 (D. Mass. Oct. 20, 2020) (concluding that Labor Management Relations Act ("LMRA") did not preempt claims for breach of contract and unjust enrichment); cf. Rose v. RTN Fed. Credit Union, 1 F.4th 56, 62 (1st Cir. 2021) (holding that LMRA preempted state law claims where plaintiff's eligibility for benefits under state regulation depended on interpretation of "temporary transfer" in CBA and wage claims that would require "construing and applying the various 'peculiarities of industry-specific wage and benefit structures' embodied in the CBA" (quoting Cavallaro v. UMass Mem'l Healthcare, Inc., 678 F.3d 1, 8 (1st Cir. 2012))).[6]

### 2. Unjust Enrichment (Count V)

As to their unjust enrichment claims, Plaintiffs argue that they worked "at a reduced rate for Cape Air" in exchange for the promise of ATP training which Cape Air "never intended to honor."  D. 55 at 17; see D. 5 ¶¶ 54, 66.  Cape Air argues that this claim is preempted because Plaintiffs wages were governed by the CBA.  D. 56 at 6-8.  The Court understands the thrust of the unjust enrichment claim to be Plaintiffs' agreement to work at a lower hourly wage that than they would have received from another employer, rather than a claim that Plaintiffs were paid less

---

[6] Although the RLA and LMRA are two different statutes, the preemption standard is "virtually identical."  Norris, 512 U.S. at 260.

than the wages owed under the CBA.  D. 55 at 17; <u>see</u> D. 5 ¶ 54.  The Court would not need to interpret or apply the CBA to resolve this claim.  <u>Compare</u> <u>Cavallaro</u>, 678 F.3d at 5 (concluding that resolving unjust enrichment claims based on failure to pay overtime as required by CBA was preempted under the LMRA) <u>with</u> <u>Hernandez v. Harvard Univ.</u>, No. 12-cv-11978-DPW, 2013 WL 1330842, at *2 (D. Mass. Mar. 28, 2013) (ruling that there was no preemption by LMRA where unjust enrichment claims are based on compensation extraneous to CBA).  Accordingly, the unjust enrichment claim is also not preempted.

**B.** **Failure to State a Claim**

*1.* *FLSA and Massachusetts Minimum Fair Wage (Counts I and II)*

Under the FLSA and Massachusetts law, employers must pay their employees a minimum wage.  29 U.S.C. § 206(a); Mass. Gen. Laws c. 151 § 1.  Under the FLSA, any wages must be "paid finally and unconditionally or 'free and clear.'" 29 C.F.R. § 531.35.  "The wage requirements of the [FLSA] will not be met where the employee 'kicks-back' directly or indirectly to the employer or to another person for the employer's benefit the whole or part of the wage delivered to the employee."  29 C.F.R. § 531.35; <u>see</u> <u>United States v. Gordon</u>, 852 F.3d 126, 139, n.14 (1st Cir. 2017) (citing <u>Arriaga v. Florida Pac. Farms, L.L.C.</u>, 305 F.3d 1228, 1236–37 (11th Cir. 2002) (explaining that employer cannot require employee to reimburse expenses primarily for employer's benefit)).  Massachusetts law forbids employers from "directly or indirectly solicit[ing], demand[ing], request[ing] or accept[ing] from any employee any return of a portion of his wages, which would result in such employee retaining less than" the state minimum wage.  Mass. Gen. Laws c. 151, § 19.[7]  Plaintiffs allege that repayment of $30,000 in supposed training

---

[7] Neither Plaintiffs nor Cape Air argues that state law would treat a training repayment provision differently from the FLSA.  <u>See, e.g.</u>, D. 32 at 5–6; D. 55 at 5–7.

costs amounts to an unlawful kickback that would cause Plaintiffs' wages to fall below the federal and Massachusetts minimum wage.  D. 5 ¶¶ 83–98.  Cape Air argues that Plaintiffs' theories have been rejected and that repayment of training and tuition costs are analogous to loans rather than unlawful kickbacks.  See, e.g., D. 43 at 6–7.

This issue has been addressed by the Ninth Circuit in Gordon and the Seventh Circuit in Heder.  Gordon v. City of Oakland, 627 F.3d 1092, 1095 (9th Cir. 2010); Heder v. City of Two Rivers (Heder II), 295 F.3d 777, 781 (7th Cir. 2002).  In Gordon, the court upheld a collective bargaining agreement which required a police officer who voluntarily left the City's employ before serving five years to pay a *pro rata* share of police academy training costs.  Gordon, 627 F.3d at 1096.  The Ninth Circuit characterized the $5,268.03 paid by the plaintiff to the city as a repayment on a partially forgiven loan that the City advanced to cover the cost of plaintiff's training.   Id. at 1095–96.  In Heder, the City withheld the entirety of a firefighter's final two paychecks under an agreement that required a firefighter who resigned less than three years after receiving paramedic training to repay "the cost of tuition, books and other training costs" and "liquidated damages" equivalent to overtime wages for training and paramedic premium pay received.  Heder v. City of Two Rivers (Heder I), 149 F. Supp. 2d 677, 688 (E.D. Wis. 2001), vacated and remanded, 295 F.3d 777.  On appeal, the Seventh Circuit upheld the enforceability of training repayment provisions that create "powerful financial incentive[s]" for employees to remain with employers who provided valuable job training under Wisconsin law.  Heder II, 295 F.3d at 781.  The Seventh Circuit likened the arrangement to a loan and concluded that the City could recoup the value of books and tuition "as an ordinary creditor."  Id. at 779.  The Seventh Circuit nevertheless agreed with the district court that the firefighter was entitled to "minimum wage for his final two pay periods" under the FLSA and that the difference between the City's withholding and minimum

wage should be credited against the firefighter's "reimbursement obligation." Id. at 782–83. Notably, the Seventh Circuit recognized that the "agreement seems to call for repayment of the overtime compensation, but . . . this violates the FLSA to the extent that it would leave [the firefighter] with less than time and a half for all overtime hours." Id. at 782.

District courts following Gordon and Heder have dismissed minimum wage kickback claims based upon contracts requiring repayment of training costs for portable licenses and certifications, provided the employer does not deduct the amount owed from an employee's paychecks. Bland v. Edward D. Jones & Co., L.P., 375 F. Supp. 3d 962, 977 (N.D. Ill. 2019) (dismissing FLSA claim based on training repayment provision for $75,000); Park v. FDM Grp. (Holdings) PLC, No. 16 CV 1520-LTS, 2017 WL 946298, at *4 (S.D.N.Y. Mar. 9, 2017) (dismissing minimum wage claims where plaintiff was required to pay $20,000 in liquidated damages for leaving employer less than two years after IT training), vacated in part on other grounds, No. 16-CV-1520-LTS, 2018 WL 4100524 (S.D.N.Y. Aug. 28, 2018); see Montoya v. CRST Expedited, Inc., 404 F. Supp. 3d 364, 390–91 (D. Mass. 2019) (holding that company could not deduct $6,500 commercial driver's license training fee from employee paychecks if doing so would reduce salary below minimum wage, but that company's post-employment collection for training, housing, and other expenses was not "unlawful kickback").

One court has reached the opposite result, denying a motion to dismiss an FLSA kickback claim based upon repayment of costs associated with a "leadership development program" valued at $46,000. Ketner v. Branch Banking & Tr. Co., 143 F. Supp. 3d 370, 374–75 (M.D.N.C. 2015). The Court emphasized that the employer's internal training program did not confer a portable certification to employees and was valued at a cost equivalent to an employee's yearly salary. Id.

Case 1:22-cv-10649-DJC Document 64 Filed 05/22/23 Page 13 of 29


at 383–84.  In such a circumstance, the court concluded that "factual development" was needed to determine whether the training costs were "a bona fide loan" or a "kick-back of salary." Id. at 384.

Here, Cape Air agreed to provide Plaintiffs the "necessary experience" and training to achieve ATP certification.[8] D. 5. ¶ 52.  On one hand, an ATP certificate is a portable credential that is a prerequisite for piloting any commercial flight. See D. 5 ¶ 32.  On the other hand, Plaintiffs also allege that the purported $30,000 training investment is unmoored from the actual cost of ATP training, which is less than $10,000.  D. 5 ¶ 81.  The plausibility of Plaintiffs' position is bolstered by the fact that Cape Air seeks the same $30,000 regardless of whether the pilot in question needed hundreds of hours of flight time (as most of the Plaintiffs did), or no flight time (like Abramov). See D. 5 ¶¶ 53, 58.  Nor does the amount vary based on the amount of time the pilot remained employed or whether the pilot in fact completed training.  See D. 5 ¶¶ 6–30, 75, 77–80.

The Court acknowledges that courts in other jurisdictions have characterized similar or greater training costs as loans rather than a kickback forbidden by the FLSA, even where the actual cost of training may be less than the amount sought by the employer.  Bland, 375 F. Supp. 3d at 977 (dismissing FLSA kickback claim on the pleadings despite "skeptic[ism] that the actual costs of training totaled $75,000").   Nor is there any firm rule that a training repayment provision amortize the debt owed based on the length of time the employee remained with the firm.  See Heder II, 295 F.3d at 782.  In the absence of binding precedent, however, this Court is not persuaded that Heder and its progeny stand for the proposition that all kickback claims involving a training repayment provision fail to state a plausible claim.  Indeed, the Heder trial court, on

---

[8] As noted previously, Cape Air promised Abramov pilot training without explicitly referencing ATP.  D. 34-1.  Plaintiffs do not argue that Abramov's FLSA claim is different from those of his co-Plaintiffs, see D. 55 at 6–7, and Abramov obtained his ATP certification while employed by Cape Air, D. 5 ¶ 80.  As such, the Court will treat Abramov's claim like his co-Plaintiffs' for the purposes of this motion.

13

remand, awarded the City only the roughly $1400 cost of books and tuition for paramedic training, not the liquidated damages the City originally withheld under the terms of the employment contract.  Heder v. City of Two Rivers (Heder III), 255 F. Supp. 2d 947, 952 (E.D. Wis. 2003) (explaining that "parties agreed that under the Seventh Circuit's decision, [fireman] was entitled to all the money in dispute except the cost of the tuition and books" and that fireman obtained a judgment for unpaid overtime and money withheld from his paychecks), aff'd, 93 F. App'x 81 (7th Cir. 2004).  The Court, however, concludes that the issue is best resolved with the benefit of discovery.  See Ketner, 143 F. Supp. 3d at 384.

Accordingly, the Court denies the motions to dismiss Plaintiffs' minimum wage claims under the FLSA and Massachusetts law (Counts I and II).

### 2.    TVPA (Count III)

The Trafficking Victims Protection Reauthorization Act created a private right of action for victims of various human trafficking crimes outlawed by the TVPA.  McLeod v. Fessenden Sch., No. 21-cv-10807-FDS, 2022 WL 3925208, at *3 (D. Mass. Aug. 31, 2022) (citing 18 U.S.C. §§ 1589, 1595).  In relevant part, the TVPA forbids "knowingly provid[ing] or obtain[ing] the labor or services of a person" by certain means.  18 U.S.C. § 1589(a).  These means include "abuse or threatened abuse of the law or legal process," which is defined as "the use or threatened use of a law or legal process . . . in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain for taking some action."  Id. § 1589(a)(3), (c)(1).  In assessing whether a TVPA violation occurred, this Court must "draw a line between improper threats or coercion and permissible warnings of adverse but legitimate consequences."  United States v. Bradley, 390 F.3d 145, 151 (1st Cir. 2004) (interpreting "threat of serious harm" under TVPA), cert. granted, judgment vacated on other grounds, 545 U.S. 1101 (2005).

The parties appear to agree that whether Cape Air's collection of the $30,000 "Training Investment" is a threat to use the legal process for a "purpose for which the law was not designed" depends upon whether the repayment provisions in Plaintiffs' employment offer letters and promissory notes are enforceable under state law.  D. 33 at 8–9 (quoting Panwar v. Access Therapies, Inc., No. 1:12-CV-00619-TWP, 2015 WL 1396599, at *5 (S.D. Ind. Mar. 25, 2015) (explaining that filing lawsuits against employees for breach of valid employment contracts "is exactly the end that the legal process at issue was designed to accomplish")); D. 55 at 7 (quoting Panwar, 2015 WL 1396599, at *4); see Baldia v. RN Express Staffing Registry LLC, No. 19 CIV. 11268 (PGG), 2022 WL 4777836, at *10 (S.D.N.Y. Oct. 3, 2022) (holding "threat to enforce assertedly unenforceable liquidated damages provision [in nurse's employment contract and promissory note] implies an attempt to initiate legal action 'for which the law was not designed'"). Cape Air argues that Plaintiffs' employment agreements are enforceable and are neither procedurally nor substantively unconscionable.  D. 32 at 9–11.  Plaintiffs do not directly dispute unconscionability, but instead characterize the $30,000 training repayment provision as an unenforceable penalty rather than a reasonable liquidated damages clause.[9]  D. 55 at 9.

Under Massachusetts law, "a contract provision that clearly and reasonably establishes liquidated damages should be enforced, so long as it is not so disproportionate to anticipated damages as to constitute a penalty."  TAL Fin. Corp. v. CSC Consulting, Inc., 446 Mass. 422, 431 (2006).  The provision will be enforced where (1) "at the time of contracting the actual damages flowing from a breach were difficult to ascertain," and (2) "the sum agreed on as liquidated

---

[9] At least one court has concluded that a plaintiff need not show both procedural and substantive unconscionability to plead a "serious harm" under the TVPA.  Carmen v. Health Carousel, LLC, No. 1:20-CV-313, 2021 WL 2476882, at *8 (S.D. Ohio June 17, 2021) (analyzing TVPA cases based on employment contract provisions and denying motion to dismiss TVPA claim).

damages represents a 'reasonable forecast of damages expected to occur in the event of a breach.'"
NPS, LLC v. Minihane, 451 Mass. 417, 420 (2008).  The party challenging the provision bears the
burden of showing that the liquidated damages sought are "grossly disproportionate to a reasonable
estimate of anticipated damages" at the time of contract formation.  TAL Fin. Corp., 446 Mass. at
432 (quotation marks omitted).  "Failing to provide any recognition for the type, or timing, of the
default, while by no means determinative, tends to indicate that the provision's intended purpose
was not to estimate the different types of damages that might arise from a future default, but to
penalize for any failure, however immaterial."  Id.

　　　Taking Plaintiffs' allegations as true and drawing all plausible inferences in their favor, the
Court concludes that Plaintiffs have adequately alleged that the $30,000 training repayment clause
is unenforceable under Massachusetts law.  Plaintiffs allege that the cost of ATP certification is
less than $10,000, and the Court infers that the Plaintiffs and Cape Air were aware of this cost
when they entered the employment contracts.  D. 5 ¶¶ 6–30, 81.  The amended complaint also
alleges that Cape Air was hiring pilots in an "aggressive recruitment program" to address an
industry-wide shortage of pilots, D. 5 ¶¶ 41, 46, from which the Court further infers that Cape Air
would be familiar with the cost of training new pilots.  See Baldia, 2022 WL 4777836, at *8
(finding that allegations that employer had hired more than 100 similarly situated nurses in the
past decade suggested employer would be familiar with actual damages).  Liquidated damages in
an amount three times more than Cape Air actually expended on Plaintiffs likely would not be
reasonable.  E. Floor Servs., Inc. v. RBC Indus., Inc., 73 Mass. App. Ct. 1103, 2008 WL 4754843,
at *3-4 (2008) (unpublished) (holding that liquidated damages that were double actual amount due
to plaintiff under contract were unenforceable).  Although Cape Air may eventually establish that
$30,000 was a reasonable estimate of a loss that was not readily ascertainable at the time of contract

formation, Plaintiffs have adequately pled that the figure does not correspond to the predicted cost of training at the time of contract formation. Falmouth Ob-Gyn Assocs., Inc. v. Abisla, 417 Mass. 176, 178 (1994) (invalidating $250,000 liquidated damages clause in doctor's employment contract which did "not correspond to any ascertainable financial costs incurred by the [employer]" in training or specialized equipment); cf. Bose Corp. v. Ejaz, 732 F.3d 17, 25 (1st Cir. 2013) (affirming district court's conclusion that liquidated damages clause was enforceable based on evidence at summary judgment stage).

Cape Air suggests that Congress could not have intended to apply the TVPA to the circumstances in this case but does not flesh out its argument. See D. 32 at 7 n.3. Courts have ruled that threats to enforce unenforceable liquidated damages provisions are plausibly threats to use the legal system for a purpose for which it was not designed. See, e.g., Baldia, 2022 WL 4777836, at *11. Such cases often arise in the context of non-citizens who may be particularly vulnerable to a threat of litigation in an unfamiliar legal system and who face threats to their immigration status alongside a financial penalty. Id. at *1, 11 (involving Filipino nurse recruited to work in United States); see Magtoles v. United Staffing Registry, Inc., No. 21CV1850KAMPK, 2021 WL 6197063, at *8 (E.D.N.Y. Dec. 30, 2021) (finding that "alleged threats of reporting, deportation, and litigation also support a claim based on an abuse of legal process"). The TVPA nevertheless does not limit its terms to immigrants, women or children. Burrell v. Staff, 60 F.4th 25, 37–38 (3d Cir. 2023) (holding that conditioning prisoners' access to work-release program on dangerous nearly-unpaid labor was abuse of legal process under TVPA). Citizen employees can plausibly plead a forced labor TVPA claim against their employer based solely on financial penalties in their employment contracts. Carter v. Paschall Truck Lines, Inc., 324 F. Supp. 3d 900, 915–17 (W.D. Ky. 2018) (denying motion to dismiss TVPA claim where citizen truck drivers were

subject to over $100,000 liability, including $5000 early termination fee and truck lease acceleration, for failing to serve as drivers for nine months); see Elmy v. W. Express, Inc., No. 3:17-CV-01199, 2020 WL 1820100, at *7 (M.D. Tenn. Apr. 10, 2020) (denying motion to dismiss truck drivers' TVPA claim based on acceleration of truck lease when drivers stopped working for employer).   Plaintiffs ultimately may need to show more than an attempt to enforce an unenforceable contract provision to prevail on their TVPA claims.   See Carter v. Paschall Truck Lines, Inc., No. 5:18-CV-41-BJB, 2023 WL 359559, at *10 (W.D. Ky. Jan. 23, 2023) (granting summary judgment against truck drivers where early-termination fee was enforceable under state law, truck driver faced only economic pressure and reasonable person in same position would not have been coerced).   At this stage of litigation, however, Plaintiffs have plausibly pled that Cape Air obtained their services by threatening an abuse of the legal process. See Baldia, 2022 WL 4777836, at *11.

Accordingly, the Court denies the motions to dismiss the TVPA claims.

### 3.   *Violation of MCRA (Count IV)*

The MCRA "provides a right of action to any person whose exercise or enjoyment of rights secured by the federal or state constitution or laws has been interfered with by 'threats, intimidation, or coercion.'" Bally v. Ne. Univ., 403 Mass. 713, 717 (1989). A "threat" means "the intentional exertion of pressure to make another fearful or apprehensive of injury or harm"; "intimidation" means "putting in fear for the purpose of compelling or deterring conduct"; and "coercion" means "the application to another of such force, either physical or moral, as to constrain him to do against his will something he would not otherwise have done." Thomas v. Harrington, 909 F.3d 483, 492 (1st Cir. 2018) (quoting Planned Parenthood League of Mass., Inc. v. Blake, 417 Mass. 467, 474 (1994)).   The Supreme Judicial Court has recognized that economic coercion alone may be actionable under MCRA, though it has not yet determined the "bounds" of such a

claim.  Buster v. George W. Moore, Inc., 438 Mass. 635, 648–49 (2003).  Without more, a "threat to use lawful means to reach an intended result is not actionable."  Id. at 648.  The First Circuit has cautioned that "the exception for claims based on non-physical coercion remains a narrow one" and that "Massachusetts courts have required 'a pattern of harassment and intimidation' to support a finding of non-physical coercion under the MCRA."  Thomas, 909 F.3d at 492–93 (quoting Nolan v. CN8, 656 F.3d 71, 77-78 (1st Cir. 2011); and then citing Howcroft v. City of Peabody, 51 Mass. App. Ct. 573, 594 (2001)).

Here, Plaintiffs appear to allege a pattern of economic coercion based on Cape Air's insistence that Plaintiffs agree to repay the $30,000 purported training investment under Plaintiffs' employment offers and promissory notes. D. 55 at 11–12.  In particular, Plaintiffs allege that Cape Air has "repeatedly demand[ed]" repayment and that "Plaintiffs believed they had no option but to continue their employment at Cape Air or they would be forced to pay a $30,000 penalty."  D. 5 ¶¶ 73–74, 131–135.  Plaintiffs need not plead a physical confrontation to survive a motion to dismiss on their MCRA claim, where they allege a pattern of economic coercion similar to MCRA claims recognized by Massachusetts courts.  See Alpha Phi Int'l Fraternity, Inc. v. President & Fellows of Harvard Coll., No. SUCV201803729E, 2020 WL 741544, at *6 (Mass. Super. Jan. 14, 2020) (finding that sorority adequately pled MCRA violation where college suggested that members may be expelled and excluded members from fellowships with significant financial benefits).

Cape Air argues that the MCRA claims are not properly pled because Plaintiffs have alleged a "direct deprivation" of Plaintiffs' right to be free from "forced service" under Mass. Gen. L. c. 265, §§ 49, 51(a) and rather than a separate threat. D. 32 at 13–14 (quoting Buster, 438 Mass. at 646.  None of the cases cited by Cape Air stand for the proposition that "[n]o claim under MCRA

exists where an element of the underlying substantive right is itself 'threat.'"  D. 32 at 13. Massachusetts cases draw a distinction between "direct deprivation of rights" without a threat, which is not actionable under MCRA, and "an attempt at coercion" which may be the basis for a MCRA claim.  See Swanset Dev. Corp. v. City of Taunton, 423 Mass. 390, 396 (1996) (holding that complaint only alleged direct deprivation where Plaintiffs "do not allege that any defendant sought to persuade them to alter or to amend their plans to conform with conditions which the defendants sought to impose illegally on the plaintiffs").  Here, Plaintiffs allege that "Cape Air required each Plaintiff to sign a contractual provision requiring Plaintiffs to pay a penalty for leaving their employment because Cape Air believed that it faced an imminent shortage of certified ATP pilots."  D. 5 ¶ 103.  As a result of the potential liability they faced, Plaintiffs continued working for Cape Air despite safety concerns, delays in training and moving expenses associated with continued employment and then faced demands for repayment.  Id. ¶¶ 70–74.  At this stage of the litigation, the Court infers from the amended complaint that the Cape Air's institution of the repayment provisions in the offer letters and promissory notes were an attempt to coerce Plaintiffs to remain employed.

Finally, Cape Air argues that any threat to collect the $30,000 training investment was a lawful use of the judicial process and could not constitute a MCRA (or TVPA violation).  D. 32 at 14.  As stated above in the analysis of Plaintiffs' TVPA claims, this Court concludes that Plaintiffs' have plausibly alleged that the training repayment provisions were unlawful and thus may proceed with their MCRA claims on this basis.

Accordingly, the Court denies Cape Air's motions to dismiss the MCRA claims.

### 4.    Breach of Contract (Count VI)

To succeed on its breach of contract claim, a plaintiff "must show (1) the existence of a valid contract; (2) that it has performed its obligations under the contract; and (3) a breach of the

contract that causes damages." <u>Lombard Med. Techs., Inc. v. Johannessen</u>, 729 F. Supp. 2d 432,

438 (D. Mass. 2010) (citing <u>Persson v. Scotia Prince Cruises, Ltd.</u>, 330 F.3d 28, 34 (1st Cir. 2003)).

The First Officer Plaintiffs and Abramov both seek a declaration that they did not breach their

contract with Cape Air and that Cape Air "breached the contract provision requiring Cape Air to

'provide [each Plaintiff] . . . the necessary experience to obtain your ATP certificate.'"  D. 5

¶¶ 118–19.[10]

### a)    <u>Enforceability of Training Repayment Provisions</u>

Cape Air argues that the Plaintiffs' claims for a declaration of non-breach should be

dismissed because employment agreements and promissory notes are "valid and enforceable" and

"clear and unambiguous language required [Plaintiffs] to remain employed throughout [their]

training and for [a minimum period] as Captain."  <u>See, e.g.</u>, D. 32 at 15.  The Court has already

concluded that Plaintiffs have plausibly pled that the training repayment provisions in their offer

letters and promissory notes are unenforceable penalties and not reasonable liquidated damages

provisions.  As such, Plaintiffs have stated a claim for a declaration of non-breach.  In the interest

of completeness, the Court assesses whether Plaintiffs have adequately pled that no breach

occurred under the alternative theory that the First Officers' and Abramov's promissory notes and

offer letters lacked consideration.

### b)    <u>Consideration for First Officer Plaintiffs' Contracts</u>

Under Massachusetts law, a valid contract requires an offer, acceptance, and consideration.

<u>Vadnais v. NSK Steering Sys. Am., Inc.</u>, 675 F. Supp. 2d 205, 207 (D. Mass. 2009).  Consideration

requires legal detriment to the promisee and a benefit to the promisor.   "[A] promise that binds

---

[10] In addition, McClain seeks contract damages in the amount of $30,000, which he paid to Cape
Air after resigning.  D. 5 ¶ 117.

one to do nothing at all is illusory and cannot be consideration." Graphic Arts Finishers, Inc. v. Bos. Redevelopment Auth., 357 Mass. 40, 42 (1970).  Where a contract lacks a definite time for performance, however, the law generally implies that performance must occur within a reasonable time instead of invalidating the contract.  Barber v. Fox, 36 Mass. App. Ct. 525, 531 (1994) (implying obligation to perform within a reasonable time and rejecting argument that contract was unenforceable and indefinite); Charles River Park, Inc. v. Bos. Redevelopment Auth., 28 Mass. App. Ct. 795, 814 (1990).

As to the First Officer Plaintiffs, Cape Air promised to provide "the necessary experience to successfully obtain [their] ATP certificate and qualify [them] as Captain for Cape Air."  See, e.g., D. 32-1.  Despite Plaintiffs' assertions to the contrary, D. 55 at 15–17, Cape Air offered valid consideration for the First Officer Plaintiffs' labor and commitment to a minimum period of service as Captains.  Graphic Arts, 357 Mass. at 42.  Cape Air agreed to hire and pay Plaintiffs and provide training so that Plaintiffs could become ATP-certified Captains.  D. 5 ¶ 52.  Plaintiffs were to receive the training to achieve ATP certification and a wage.  See id. ¶ 54.

Plaintiffs appear to argue that the lack of any deadline in the employment offers and promissory notes rendered Cape Air's promises illusory.  D. 55 at 15–16.  The appropriate outcome in this circumstance, however, is not to invalidate the contract or allow Cape Air to string along Plaintiffs indefinitely.  Instead, the Court will imply that Cape Air was obligated to provide the requisite training in a reasonable time frame based on "the nature of the contract, the probable intention of the parties as indicated by it, and the attendant circumstances."  Charles River, 28 Mass. App. Ct. at 814.  Accordingly, any claim for declaratory judgment of non-breach on the basis that the First Officers' offer letters and promissory notes were illusory is dismissed and the

claim for a declaratory judgment as to non-breach based on the adequacy of consideration survives

only as to Abramov.[11]

c)    <u>Ambiguity in Obligation to Repay Training Costs</u>

The First Officer Plaintiffs and Abramov also seek a declaration of non-breach on the basis

that they "resigned prior to <u>initiating</u> service as a Captain."  D. 5 ¶ 121 (alteration in original).

Plaintiffs appear to argue that the phrase "prior to *completing* [minimum number of] months of

service as a Captain with Cape Air, you will be required to repay the reasonable costs and training

investment" imposes a repayment obligation only if a pilot begins serving as Captain but resigns

before completing the minimum required period of service.  <u>See</u> D. 32-1 (emphasis added).  Cape

Air asserts that the contract is unambiguously requires repayment by the First Officer Plaintiffs.

D. 32 at 12.

"The determination of whether the terms of a contract are ambiguous is a question of

law."  <u>Salls v. Digital Fed. Credit Union</u>, 349 F. Supp. 3d 81, 86 (D. Mass. 2018) (quoting

<u>Baybank Middlesex v. 1200 Beacon Properties, Inc.</u>, 760 F. Supp. 957, 963 (D. Mass. 1991)).

---

[11] To the extent Abramov alleges that his offer letter was illusory because it contained no time
frame for Cape Air to provide him the promised training, D. 5 ¶ 126, his claim for declaratory
judgment of non-breach similarly fails.  Abramov's claim for a declaratory judgment of non-
breach otherwise survives, however, because the adequacy of consideration supporting his
repayment obligation is unclear.  Abramov's employment offer, unlike those of his co-Plaintiffs,
made no mention of repayment of training costs should Abramov resign prior to serving as Captain
for a minimum period. D. 34-1.  Thus, the repayment obligation was not a term Abramov initially
agreed to as part of his employment.  Continued employment was not sufficient consideration for
extracting this additional promise from Abramov as Cape Air asserts, D. 34 at 8–9, because Cape
Air could only terminate Abramov and his co-plaintiffs for cause, D. 56 at 8.  Cape Air forwent
none of its rights under the contract by continuing to employ Abramov, because it had no right to
terminate Abramov in the first place.  <u>Cf.</u> <u>Cochran v. Quest Software, Inc.</u>, 328 F.3d 1, 9 (1st Cir.
2003) (concluding that "employer's forbearance from ending the employment relationship,
coupled with the employee's continued performance, can satisfy the consideration requirement"
with regard to at-will employment contracts).

"Terms will be found ambiguous only when they 'are inconsistent on their face or where the phraseology can support reasonable difference of opinion as to the meaning of the words employed.'" Id. (quoting Fashion House, Inc. v. K Mart Corp., 892 F.2d 1076, 1083 (1st Cir. 1989)). Plaintiffs' position has some support in the logic that Cape Air would not necessarily incur any "reasonable costs and training investment" if a pilot resigned without completing or even undergoing the training. Cape Air offers no explanation as to why this interpretation is unreasonable and merely emphasizes that the offer letters provides that upon obtaining ATP, a pilot must "thereafter serve for a minimum [period] as a Captain." D. 32 at 12 (emphasis in original) (quoting D. 32-1). Neither party disputes that the terms of the offer letters require Plaintiffs to serve as a Captain. In the absence of further briefing from either party, the Court concludes that the Plaintiffs have plausibly pled an ambiguity in the contract.

As to Abramov, Cape Air argues that even if Plaintiffs succeed in establishing that any repayment obligation was only effective if a pilot initiated service as Captain, Abramov would not benefit from such an interpretation. D. 34 at 14. The Court agrees that the amended complaint alleges that Abramov began working as a Captain prior to his resignation (unlike the First Officer Plaintiffs) and thus Abramov cannot establish non-breach on this basis. D. 5 ¶¶ 8, 80, 82.

Accordingly, the Court grants the motion to dismiss Abramov's breach of contract claim as to the ambiguity in whether the repayment obligation applied to him.

d)      Cape Air's Alleged Breaches of Contract

As to the First Officer Plaintiffs' claim that Cape Air breached its contracts with them, Cape Air argues that no breach occurred because the "Employment Agreement does not, however, set a deadline by which ATP training and certification must be completed." D. 32 at 18. As explained above, where the contract is missing a deadline for compliance, the Court may imply in a reasonable time frame and assess whether Cape Air met that obligation. Charles River, 28 Mass.

App. Ct. at 814.  As such, the First Officer Plaintiffs' have adequately alleged a breach of contract to survive the motions to dismiss.

As to Abramov, Cape Air argues that it could not have breached any obligation to train Abramov, because Abramov in fact obtained ATP certification and began working as a Captain for Cape Air.  D. 34 at 14.  Although Abramov had sufficient flight hours to be ATP-eligible and Cape Air initially offered him employment as a Captain, Abramov did not receive ATP certification and begin working as Captain until more than a year later. D. 5 ¶¶ 8, 58, 80; D. 34-1. Accepting the allegations as true and drawing plausible inferences in Abramov's favor, the amended complaint pleads that Cape Air breached the contract by unreasonably delaying Abramov's training and thus his start date as Captain.  See id. ¶ 70.  Abramov's claim for breach of contract is plausibly alleged.

Accordingly, the Court dismisses only (1) the First Officers' claims for a declaration of non-breach on the basis that the employment offer letters and promissory notes were illusory and (2) Abramov's claim for a declaration of non-breach on the basis that the repayment obligation did not apply to resignations prior to initiating service as Captain.  Cape Air's motion to dismiss the breach of contract claims are otherwise denied.

### 5.    *Unjust Enrichment (Count V)*

"A plaintiff is not entitled to recovery on a theory of unjust enrichment where a valid contract defines the obligations of the parties."  Malden Police Patrolman's Ass'n v. Malden, 92 Mass. App. Ct. 53, 60 (2017).  Fed. R. Civ. P. 8(d), however, "permits [p]laintiffs to plead alternative and even inconsistent legal theories, such as breach of contract and unjust enrichment, even if [p]laintiffs can only recover under one of these theories."  Lass v. Bank of Am., N.A., 695 F.3d 129, 140 (1st Cir. 2012) (quoting Vieira v. First Am. Title Ins. Co., 668 F. Supp. 2d 282, 294–95 (D. Mass. 2009)).  To the extent that the existence of a contract prevents recovery on an

unjust enrichment claim, Plaintiffs may proceed on these alternative theories at this stage in the litigation.  Lass, 695 F.3d at 140.

To succeed with an unjust enrichment claim under Massachusetts law, a plaintiff must show that the defendant received, was aware of, and accepted or retained a benefit conferred by the plaintiff 'under circumstances which make such acceptance or retention inequitable.'"  Id. (quoting Vieira, 668 F. Supp. 2d at 294).  Plaintiffs claim that Cape Air was unjustly enriched because Plaintiffs worked "at a reduced rate for Cape Air" in exchange for the promise of ATP certification, which Cape Air "never intended to honor."  D. 55 at 17; see D. 5 ¶¶ 54, 66.  As a result, Cape Air was able to attract and retain aspiring pilots at a low cost in the face of a perceived shortage of certified pilots.  D. 5 ¶¶ 41–42, 46.  At a later stage in the litigation, Cape Air may well show that Plaintiffs' did not bestow any "quantifiable" benefits onto Cape Air beyond performance of job duties for which they were properly compensated.  See Lockwood v. Madeiros, 506 F. Supp. 3d 73, 81 (D. Mass. 2020) (granting summary judgment in favor of employer on unjust enrichment claim).  For now, the unjust enrichment claims are adequately pled.

Cape Air also argues that the unjust enrichment claims are preempted by the FLSA "to the extent [they] relate[] to wages."  D. 32 at 19.  The cases cited by Cape Air are inapposite because Plaintiffs do not allege that Cape Air failed to compensate them for hours worked as an employee. Sullivan v. Dumont Aircraft Charter, LLC, 364 F. Supp. 3d 63, 88 (D. Mass. 2019) (holding that unjust enrichment and breach of contract claims based on employer's "failure to compensate" were preempted, but that claims falling outside the scope of the FLSA were not preempted); Cosman v. Simon Roofing & Sheet Metal Corp., No. CIV.A. 12-11537-DJC, 2013 WL 2247498, at *2 (D. Mass. May 17, 2013) (holding that misrepresentation claims based on "failure to 'compensate Plaintiffs for their time spent completing paperwork'" would "duplicate FLSA claims" and be

preempted).  Plaintiffs do not allege that Cape Air failed to pay them for certain hours of work or paid them less than the statutory requirement for certain hours of work.  Drawing plausible inferences in Plaintiffs' favor, Cape Air was unjustly enriched because it obtained Plaintiffs' labor at a lower price than it would otherwise have paid by disingenuously promising training for ATP certification.  Put another way, Plaintiffs' unjust enrichment claim based on their hourly wage does not merely "duplicate" minimum wage claims that Cape Air illegally demanded a kickback.  Thus the unjust enrichment claim is not preempted.  Manning v. Bos. Med. Ctr. Corp., 725 F.3d 34, 55 (1st Cir. 2013) (explaining that common law claims to recover overtime pay were preempted by FLSA, but recovery of straight-time pay was not).

Accordingly, the Court denies Cape Air's motion to dismiss the unjust enrichment claims.

### 6.    Breach of the Duty of Good Faith and Fair Dealing (Count VII)

Under Massachusetts law, "every contract is subject to an implied covenant of good faith and fair dealing."  Anthony's Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 473, 583 N.E.2d 806, 821 (1991).  This covenant "requires that 'neither party shall do anything that will have the effect of destroying or injuring the right of the other party to the fruits of the contract.'"  T.W. Nickerson, Inc. v. Fleet Nat. Bank, 456 Mass. 562, 570 (2010) (quoting Anthony's Pier Four, 411 Mass. at 471–72).  "In other words, the parties to a contract implicitly agree 'to deal honestly and in good faith in both the performance and enforcement of the terms of their contract."  Clinical Tech., Inc. v. Covidien Sales, LLC, 192 F. Supp. 3d 223, 237 (D. Mass. 2016) (internal quotation marks and citations omitted), aff'd, 772 F.3d 925 (1st Cir. 2014).  This implicit duty applies "[w]here a party to a contract makes the manner of its performance a matter of its own discretion." S.M. v. M.P., 91 Mass. App. Ct. 775, 785 (2017).

Cape Air argues that the First Officer Plaintiffs and Abramov fail to plead bad faith,  D. 32 at 20, but does not dispute Plaintiffs' offer letters and promissory notes left the manner of

distributing flight time up to Cape Air's discretion.  See id. at 18 (arguing that Plaintiffs' contracts do not "set a deadline by which ATP training and certification must be completed").   The amended complaint alleges that Cape Air "embarked on an aggressive recruitment program during late 2020 . . . promis[ing] aspiring ATP-certified pilots that – upon being hired – the company would give them enough flight time to attain ATP certification."  D. 5 ¶ 46.  The hiring continued even though Cape Air knew that it was experiencing a steep decline in air travel caused by the pandemic. D. 5 ¶¶ 43–46.  Once the First Officer Plaintiffs began working at Cape Air, they "realized that the company did not intend to offer them enough flight hours to become ATP-eligible" and "spent months waiting for training to finish so they could finally start gaining flight hours."  D. 5 ¶¶ 66– 70.  By Cape Air's own accounting, even pilots who successfully achieved certification did not begin working as Captains until fourteen months into their employment.  D. 32 at 18; see D. 5 ¶¶ 8, 12, 24, 26, 77–80.  Plaintiffs have plausibly pled Cape Air did not exercise its discretion to allocate flight time in good faith to retain Plaintiffs at a reduced hourly rate and to prevent Plaintiffs from receiving the fruits of their contracts, namely the opportunity to obtain the flight hours necessary to become ATP-eligible in a reasonable time. [12]  Anthony's Pier Four, 411 Mass. at 473 (affirming ruling that the implied covenant of good faith and fair dealing was breached where party used "discretionary right" to approve of changes in development plan as a "pretext" for obtaining more money).  Cape Air may ultimately prevail in showing that it distributed flight hours to the First Officer Plaintiffs in good faith, but for the purposes of the Rule 12(b)(6) motions, the Court concludes that the First Officer Plaintiffs and Abramov have plausibly pled a breach of the implied covenant of good faith and fair dealing.

---

[12] The Court notes that Abramov did obtain ATP certification prior to his resignation.  The Court understands Abramov's claim to focus on the near fourteen-month delay between his hiring and the completion of his training and ATP certification.  D. 5 ¶¶ 8, 80.

Accordingly, the Court denies Cape Air's motions to dismiss the claims for breach of the implied duty of good faith and fair dealing.

## VI.     Conclusion

For the foregoing reasons, the Court ALLOWS Cape Air's motions to dismiss, D. 19–D. 30, as to Count VI (breach of contract) only with respect to the declaratory judgment that First Officer Plaintiffs seek that they did not breach their employment contracts with Cape Air because these contracts were illusory, and to Abramov's basis for the same claim that the repayment obligation did not apply to him prior to beginning his service as Captain.  Cape Air's motions to dismiss, D. 19–D. 30, are otherwise DENIED.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge